IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| CONSTANCE L. FUSS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:05CV00585 |
| | ) |
| STATE OF NORTH CAROLINA and | ) |
| NORTH CAROLINA DEPARTMENT | ) |
| OF HEALTH AND HUMAN SERVICES, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

**Sharp, Magistrate Judge**

This matter comes before the Court on the motion for summary judgment of Defendants State of North Carolina and North Carolina Department of Health and Human Services. (Pleading No. 19.) Plaintiff Constance Fuss has opposed the motion, and Defendants have filed a reply. The motion is ready for a ruling.

**Procedural History**

Plaintiff Constance Fuss brought this action pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA"). (Pleading No. 3, Complaint ("Compl.").) Fuss alleges that Defendants State of North Carolina and North Carolina Department of Health and Human Services ("Defendants" or "North Carolina") acted as her "employer" in connection with her job as a live-in caregiver for two quadriplegic men. Compl. ¶¶ 4, 6-7. Plaintiff

alleges that she worked in excess of forty hours per week without being paid overtime. *Id.* ¶ 7. Defendants deny that there has even been an employer-employee relationship between Plaintiff and Defendants. Defendants move for summary judgment on the grounds that, as a matter of law, they were not Plaintiff's employer within the meaning of the FLSA.

**Statement of Facts**

The North Carolina Department of Health and Human Services ("DHHS") provides for the health, safety and well being of North Carolina residents. (Pleading No. 19, Mot. for Summ. J., Affidavit of Elizabeth Bishop ("Bishop Aff.") ¶ 4). The Division of Vocational Rehabilitation ("VR") is a division of the DHHS that, through state and federal funding, provides counseling, training, education, medical, transportation, and other support services to persons with physical or mental disabilities so they may live and work as independently as possible. *Id.* ¶¶ 6-8. Independent Living Services ("IL") is a program within VR. IL's clients include individuals with spinal cord and brain injuries, muscular dystrophy, multiple sclerosis, cerebral palsy, amputations, sensory impairments and diabetes. *Id.* ¶ 9. Counselors and clients jointly develop a plan to achieve the goals of the program. *Id.* An IL counselor's role includes counseling and encouraging clients; providing information, resources and referrals; helping to locate and secure housing and medical equipment; and providing independent living skills training. *Id.* ¶¶ 10-11.

The IL program has adopted certain policies and procedures, including a Personal Assistance Services Policy contained in Policy Manual Section 2-18. (Pleading No. 19, Exs.

numbered 620-29; *see also* Bishop Aff. ¶¶ 16-24.) Pursuant to this policy, the program does not employ personal care assistants for eligible participants. *Id.* Instead, where funding is approved, IL allows the client to hire and pay an assistant to help with his or her needs, and IL arranges for reimbursement to the client for approved services or equipment. *Id.* In connection with attendant care, the IL client is responsible for hiring a caregiver, withholding and reporting taxes, and paying the caregiver. *Id.* The IL program receives no monetary or tangible benefit from the care that personal attendants provide to its clients. (Bishop Aff. ¶ 16.) IL clients sign an Independent Living Rehabilitation Program Attendant Care Client Services and Reimbursement Agreement in which the client acknowledges that he or she will act as the employer of any caregiver he or she retains, and will be responsible for withholding, reporting and paying state and federal taxes. (Pleading No. 19, Exs. numbered 634-637.)

Plaintiff Fuss relocated to North Carolina in 2002 in order to work as a nanny to her daughter's children. (Pleading No. 19, Deposition of Constance Fuss ("Fuss Dep.") at 25-27.) Fuss' daughter ended up having Fuss involuntarily committed to a mental health facility in High Point for a manic-depressive condition. *Id.* at 38-43. After Fuss was released from the facility, she sought services from the North Carolina Division of Vocational Rehabilitation Services ("VR"). *Id.* at 43. An individual at VR noted that Fuss had a strong work history as a live-in caregiver for quadriplegic and other disabled

individuals, and agreed to put Fuss in touch with Walter Flowers, the unit manager for the IL program. *Id.* at 45.

In or about December 2002, Plaintiff Fuss called the Greensboro division of the IL program to express her interest in working as a caregiver for IL clients. *Id.* at 46. Subsequently, Fuss met with Flowers in person. *Id.* In her deposition, Fuss described the meeting with Flowers as a "typical interview." *Id.* at 47-48. She could not recall what, if any, forms she filled out. *Id.* Flowers averred that he advised Fuss that the IL program did not hire or employ attendant care workers, but that he agreed to put her in contact with any of IL clients who were looking for a caregiver. (Pleading No. 19, Affidavit of Walter Flowers ("Flowers Aff.") ¶¶ 15-19; Fuss Dep. at 48-49.) One such client was Billy Dixon. Dixon had been referred to the IL program in March 2000, after expressing a desire to move out of his nursing home and live independently. Flowers acted as Dixon's IL counselor and helped Dixon develop a plan for living independently. (Pleading No. 19, Affidavit of Billy Dixon ("Dixon Aff.") ¶¶ 3-4.) Between 2000 and 2002, Dixon had been trying to locate a caregiver, and IL had been trying to locate a house for Dixon, without success. *Id.* ¶ 7. In or about February 2003, Flowers told Dixon about Fuss. (Flowers Aff. ¶ 8; Dixon Aff. ¶ 8.)

In March 2003, Dixon interviewed Fuss for a position as his personal caregiver (Dixon Aff. ¶ 9.) Dixon's social worker, nursing home staff, and Flowers were all present for at least part of the interview. *Id.* Fuss expressed her interest in a live-in situation. *Id.* Dixon took the matter under consideration. *Id.* ¶ 10. Around the same time, another

quadriplegic, Barry Robinson, was trying to move out of his nursing home and was also looking for an independent living situation and a personal attendant. (Pleading No. 19, Affidavit of Barry Robinson ("Robinson Aff.") ¶ 7.) Flowers told Robinson about Fuss. *Id.* ¶ 8. Subsequently, Robinson and Fuss met to discuss the possibility of Fuss working for Robinson. *Id.* Robinson was eligible for 21 hours per week of attendant care through the IL program. (Fuss Dep. at 58.) Ultimately, Robinson also decided to hire Fuss. (Robinson Aff. ¶ 12.) Flowers stated in his deposition that he put Fuss in contact with Dixon and Robinson and checked Fuss' references, but otherwise denied playing any role in the decisions of Dixon or Robinson to hire Fuss. (Pleading No. 19, Deposition of Walter Flowers ("Flowers Dep.") at 38.)

Sometime in February 2003, the IL program located a house in Burlington that would, with minor modification, meet the needs of two disabled clients. (Flowers Aff. ¶ 22.) Dixon and Robinson decided to hire Fuss as their personal attendant and agreed to allow her to live in the three-bedroom house with them, rent-free. (Dixon Aff. ¶ 10; Robinson Aff. ¶ 12.) Fuss understood that IL funded 21 hours per week for Robinson and 40 hours per week for Dixon. (Fuss Dep. at 50, 58.) It was the decision of Robinson and Dixon to "share" Fuss' services. Flowers explained to Fuss that her hours for Dixon and Robinson could not overlap, and that her hours for Robinson could not overlap with the care he was receiving from other caregivers such as Angel Hands. (Flowers Aff. ¶ 47; Flowers Dep. at 60.)

In April 2003, Dixon and Robinson moved into the house in Burlington with Fuss as their live-in attendant. On April 1, 2003, Jeff Hodges, the case work assistant for the Greensboro IL program, met with Robinson, Dixon and Fuss at the house to explain IL's attendant care policy. (Dixon Aff. ¶ 11; Robinson Aff. ¶ 10; Pleading No. 19, Affidavit of Jeff Hodges ("Hodges Aff.") ¶¶ 13-16.) Dixon and Robinson each signed an "Independent Living Rehabilitation Program Attendant Care Client Services and Reimbursement Agreement," acknowledging that each of them acted as Fuss' employer and that each of them was responsible for withholding and reporting taxes for Fuss. (Pleading No. 19, Exs. numbered 634-37.) Dixon was entitled to be reimbursed by IL for up to 40 hours per week, and Robinson for up to 21 hours per week, for attendant care. Fuss enjoyed free room and board, and had her own separate bedroom and bathroom. (Fuss. Dep. at 84-88.)

Fuss signed two separate documents entitled "Attendant Understanding of Employer Obligation to Withhold Social Security and Medicare Taxes (FICA)," acknowledging that Dixon and Robinson were her employers. (Pleading No. 19, Exs. numbered 638-39.) She admitted in her deposition that she did so voluntarily after reading and understanding the documents. (Fuss Dep. at 143-45.) Dixon and Robinson paid Fuss for her services and were reimbursed by IL for the authorized amounts. (Dixon Aff. ¶ 16; Robinson Aff. ¶ 15.)

Plaintiff's job generally required her to provide hygiene care, prepare meals, and maintain the household. (Dixon Aff. ¶¶ 14, 17; Robinson Aff. ¶¶ 13, 17, 22; Fuss Dep. at 64-67; Ex. numbered 670.) It was up to Dixon and Robinson to keep Fuss informed of their

needs. (Fuss Dep. at 78-79.) Because IL only sponsored 40 hours per week for Dixon and 21 hours per week for Robinson, it was agreed that Fuss would work evenings (starting at 3 p.m.) and weekends. (Fuss Dep. at 64, 76; Ex. numbered 669.) On weekday mornings, Dixon and Robinson received attendant care from an outside company funded by Medicaid. (Fuss Dep. at 69.) For Dixon, this Medicaid-funded assistance lasted 45 days, after which time Fuss began to perform certain tasks for Dixon in the mornings. (Dixon Aff. ¶ 20.) Fuss submitted time sheets to IL that reflected no more than forty hours per week for Dixon and no more than twenty-one hours per week for Robinson. (Fuss Dep. at 70; Pleading No. 19, Exs. numbered 03-43, 336-66.) Based on these time sheets, IL reimbursed Dixon and Robinson for amounts paid to Fuss.

Fuss testified that she lived in the house free of charge and did not pay for the majority of her meals, but maintains that this was not part of her compensation. (Fuss Dep. at 90-93.) She testified that she was able to exercise, run errands, and visit family members during the time that she worked for Dixon and Robinson. *Id.* at 67, 99, 101, 104. Progress reports prepared by Fuss' VR counselor reflect that she worked a side job as a housekeeper during the hours she was not caring for Dixon and Robinson. (Pleading No. 19, Ex. numbered 670.) She received no training or directions from IL regarding the care of Dixon and Robinson. (Fuss Dep. at 130-32.) Her W-2 forms reflect Dixon and Robinson as her employers for the relevant time period. (Pleading No. 19, Ex. RP-1.) Nevertheless, she maintains that Flowers was "running the show" and effectively required her to misrepresent

her time on her time sheets. (Fuss Dep. at 137, 146.) Fuss further maintains that she was, in fact, on duty 140 hours per week – that is, at the beck and call of both men twenty hours a day, seven days a week. (Fuss Dep. at 102.) She claims that Flowers told her to be available to Robinson and Dixon at all times that the Medicaid-sponsored attendants were not present. *Id.* at 69-70. She had tried to get Flowers to agree to increase her compensation to reflect the additional time worked, but Flowers advised that the agency could not do so. *Id.* at 35.

Flowers averred that IL dictated the number of hours for which Dixon and Robinson could be reimbursed for attendant care services and the rate of pay for such services, but denied that he ever asked Fuss to work more hours than those for which reimbursement was authorized or that he ever told her how to structure her hours. (Flowers Aff. ¶ 56; Flowers Dep. at 61-65.) Flowers admitted that occasionally he might have asked Fuss to accompany Robinson to a doctor's appointment or to pick up medication, but denied that he dictated her duties on a daily basis. (Flowers Aff. ¶¶ 45, 48.) He stated in his deposition that he did not recall ever telling Fuss that she could not leave the house. (Flowers Dep. at 82.) The agency itself had no authority to "fire" Fuss or terminate her services. *Id.* at 124.

Fuss and Robinson did not get along well. Fuss consulted Flowers numerous times about her problems with Robinson, and also called the police on at least three occasions due to Robinson's conduct. *Id.* at 109-112. Robinson eventually entered substance abuse treatment and, upon his release from that program in late September 2003, Fuss refused to

work for him again. (Robinson Aff. ¶ 35.) Fuss continued to work for Dixon until on or about October 6, 2003, when Dixon was admitted to the hospital for pressure sores. (Dixon Aff. ¶ 29.) After he had healed, Dixon decided to remain in a nursing home instead of returning to the independent living situation with Fuss. *Id.* ¶ 30.

Plaintiff Fuss received unemployment benefits for some period of time after she left Dixon's employment. (Fuss Dep. at 36.) She subsequently encountered problems with the Internal Revenue Service because Robinson had failed to file her withholding forms. *Id.* Her difficulties in dealing with that problem culminated in this litigation.

## Discussion

The summary judgment standard of review under Rule 56 of the Federal Rules of Civil Procedure is well established. A party is entitled to judgment as a matter of law upon a showing that "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The material facts are those identified by controlling law as essential elements of claims asserted by the parties. A genuine issue as to such facts exists if the evidence forecast is sufficient for a reasonable trier of fact to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In evaluating a forecast of evidence on summary judgment review, the court must

-9-

Case 1:05-cv-00585-PTS   Document 25   Filed 08/09/06   Page 9 of 18

view the facts and inferences reasonably to be drawn from them in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

When the moving party has carried its burden, the nonmoving party must come forward with evidence showing more than some "metaphysical doubt" that genuine and material factual issues exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), *cert. denied,* 481 U.S. 1029 (1987). A mere scintilla of evidence is insufficient to circumvent summary judgment. *Anderson*, 477 U.S. at 252. Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. *Id*. at 248-49. Trial is unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993).

On this motion for summary judgment, the Court is presented with the issue of whether an employer-employee relationship existed between Plaintiff Fuss and the North Carolina Defendants. Plaintiff bears the burden of proving that Defendants were joint employers with Dixon and Robinson for purposes of the FLSA. *Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986). The FLSA provides little guidance as to what constitutes "employment" sufficient to trigger the protections of the Act. An "employee" is defined as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). To "employ" means "to suffer or permit to work." *Id.* § 203(g). Because the FLSA does not define which activities constitute "employment," courts use its commonly understood meaning to determine the

-10-

Case 1:05-cv-00585-PTS   Document 25   Filed 08/09/06   Page 10 of 18

status of a particular relationship on a case-by-case basis. "Employment" refers to "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944). In making this determination, courts remain mindful that "[t]he employer-employee relationship does not lend itself to rigid *per se* definitions, but depends upon the circumstances of the whole activity." *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1361 (8th Cir. 1993) (internal quotations omitted).

Defendants cite the case of *Benshoff v. City of Virginia Beach*, 180 F.3d 136 (4th Cir. 1999) in support of their argument that no employment relationship existed between Plaintiff Fuss and Defendants State of North Carolina and DHHS. In *Benshoff*, seven plaintiffs were employed as firefighters for the City of Virginia Beach. As part of their employment, they were required to receive basic life support training. They opted also to receive advanced life support certification, and elected to serve in private, all-volunteer rescue squads providing emergency medical services throughout the City. Each rescue squad was a separately incorporated non-profit entity, but was coordinated and overseen to some extent by the Department of Emergency Medical Services ("DEMS"), an agency created by the City. Plaintiffs sued the City, seeking overtime compensation under the FLSA for their services as rescue squad members. The district court granted summary judgment to the City, and the Fourth Circuit affirmed the decision. *Id.* at 142-146. The Court found that the City's

-11-

financial assistance and oversight of, and benefit from, the rescue services were insufficient to create an employment relationship between the City and the rescue workers.

In the case at bar, as in *Benshoff*, the Defendants North Carolina and DHHS sponsored the independent living program and assisted in scheduling attendant care and arranging for funding. However, Defendants' supervision and control of the attendant care workers was limited. Although the structure of the IL program ensures that participants have the facilities necessary to establish an independent living situation, Defendants do not select or provide the care-givers. Participants in the program are provided with as much autonomy as possible to select and direct the services funded by state and federal programs. Defendants did establish the maximum amount for which Dixon and Robinson could be reimbursed for expenses associated with their independent living situation. They did not, however, dictate who would serve as a participant's caregiver and did not dictate the tasks to be performed. Like the workers in *Benschoff,* Plaintiff Fuss fully understood the arrangement and opted to participate within the constraints of the program.

Plaintiff Fuss admits that she was hired directly by Dixon and Robinson, but maintains that Defendants qualify as "joint" employers with Dixon and Robinson under the FLSA. The FLSA recognizes a broad definition of employer and contemplates several simultaneous employers, each responsible for compliance with the Act. *See* 29 C.F.R. § 791.2(a); *Falk v. Brennan*, 414 U.S. 190, 195 (1973) . The pertinent regulations define "joint employment" as "a condition in which a single individual stands in the relation of an

employee to two or more persons at the same time." 29 C.F.R. § 500.20(h)(5). "A determination of whether the employment is to be considered joint employment depends upon all the facts in the particular case." *Id.* The concept of joint employment has been addressed on occasion by courts in the Fourth Circuit. *See Ricketts v. Vann*, 32 F.3d 71 (4th Cir. 1994); *Howard v. Malcolm*, 852 F.2d 101 (4th Cir. 1988)*; Haywood v. Barnes,* 109 F.R.D. 568, 586-87 (E.D.N.C. 1986). To determine whether a joint employment relationship exists, a court must judge the economic realities of each individual case. *See Ricketts*, 32 F.3d at 75-76; *Howard*, 852 F.2d at 104-05. A number of factors inform this determination: (1) ownership of the property and facilities where the work occurred; (2) the degree of skill required to perform the job; (3) investment in equipment and facilities; (4) permanency and exclusivity of employment; (5) the nature and degree of control of the worker; (6) the degree of supervision of the work; (7) the power to determine the pay rates or the methods of payment of the workers; (8) the rights to hire, fire, or modify the work conditions of the worker; and (9) preparation of payroll and payment of wages. *Haywood*, 109 F.R.D. at 587 (finding migrant farm workers to be employees of both farmers and farm labor contractors). The presence or absence of any individual factor is not dispositive; rather, the determination of the legal issue depends "'upon the circumstances of the whole activity.'" *Id.* (*citing Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).

In this case, it is undisputed that Defendants did not own the property where Plaintiff Fuss worked.

-13-

The work performed by Plaintiff Fuss was, for the most part, unskilled and unspecialized, and was not inseparably or distinctively associated with the work performed by Defendants, although it did contribute to Defendants' mission.

The record contains no evidence on the third factor, investment in equipment.

Regarding the fourth factor, Fuss' employment was not permanent or exclusive. She was employed at the will of Dixon and Robinson. Significantly, Fuss' progress reports from VR show that during the time she worked as a personal attendant, her employment was not exclusive, and she also worked as a housekeeper for other individuals. Fuss appears to admit that at least for part of her employment, she regularly left the house to attend to other matters. Fuss testified that, at one point during her employment, the agency caring for Robinson complained to Flowers that Fuss was leaving Dixon alone in the mornings, and Flowers told Fuss "not to leave [the house] at any time, 24 hours a day, not to leave home except . . . to go to the laundromat . . .[and] to make sure that [she] did it when a CNA was there." (Fuss Dep. at 69-70.) She perceived this simply to mean that she was not to leave Billy Dixon alone when Robinson's caregiver was at the house. *Id.* at 70.

Under the fifth and sixth factors, Fuss' job duties were dictated primarily by Dixon and Robinson. Defendants did not tell Fuss how to perform her duties, what meals to prepare, how to clean the house, how to administer medicine or how to perform any other personal attendant duties; those directions came primarily from Dixon and Robinson.

Under the seventh factor, Defendants concede that the IL program dictated the hourly pay rate and number of hours for which Dixon and Robinson would be reimbursed. However, this did not preclude Dixon and Robinson from using other sources of income to compensate Fuss for additional hours that she might have spent caring for them. It is undisputed that only Dixon and Robinson had the right to hire and fire Fuss; the fact that Flowers referred Fuss to Dixon and Robinson, and checked her references for them, did not alter that fundamental autonomy. Fuss was paid for her services by Dixon and Robinson and at no time did she receive any checks from Defendants.

Fuss cites *Falk v. Brennan*, 414 U.S. 190 (1973), and *Bonnette v. California Health and Welfare Agency*, 414 F. Supp. 212 (N.D. Ca. 1976), *aff'd,* 704 F.2d 1465, 1469-70 (9th Cir. 1983), in support of her argument that the "economic reality" of the relationship was that Defendants were joint employers with Dixon and Robinson. In *Falk*, the Court found that maintenance workers at an apartment building were employees of both the owner of the building *and* the real estate management company that managed the building. The court found that the real estate company had "substantial control of the terms and conditions of the work of" the building employees. *Id.* at 195. It employed maintenance workers and purchased materials necessary for the operation and maintenance of the building, and received significant monetary remuneration for this service. The facts in the *Falk* case are distinguishable from the facts in the present case. There is no dispute that the house in which Plaintiff, Dixon and Robinson lived was owned by First Baptist Service Corp. and

-15-

managed by Robert Brown. The Defendants did not own, maintain or manage the premises where Fuss worked. Dixon and Robinson had the right to hire and fire Fuss. Fuss' day-to-day job duties were dictated primarily by Dixon and Robinson. IL received no monetary benefit akin to that received by the real estate management company in *Falk*.

In *Bonnette,* a Ninth Circuit case, the district court denied summary judgment to state agencies that were sued by domestic workers under the FLSA minimum wage provision. 414 F. Supp. at 214. The district court's decision was affirmed on appeal. *Bonnette*, 704 F.2d at 1469-70. The basic factual similarities between *Bonnette* and the instant case are undeniable. There, as here, the plaintiffs assisted disabled welfare recipients with basic daily chores. *Id.* Applying a four-factor test, the *Bonnette* court found that the state agencies had the clear authority to hire and fire the workers; in some instances directly paid the workers and, in any event, dictated the hours and compensation; and maintained employment records. *Id.* at 1470. Most significantly, the court found that the agencies "exercised considerable control over the structure and conditions of employment," by intervening in disputes "when problems arose which the recipient and the chore worker could not resolve." *Id.* at 1470. In analogizing the facts of *Bonnette* to this case, Plaintiff points to evidence that Flowers intervened in the relationship between Plaintiff and IL's clients on an occasional basis, to offer Fuss advice and to mediate disputes between Robinson and Fuss. Specifically, Plaintiff points to an occasion when Flowers directed Fuss to retrieve and administer medicine to Robinson for a burn to his hand. (Flowers Dep. at 74-76.)

-16-

Applying the nine-factor test outlined in *Haywood v. Barnes*, the Court determines that Defendants were not a joint employer of Plaintiff Fuss. The economic reality of the relationships at issue is that Billy Dixon and Barry Robinson controlled Plaintiff's employment for their primary benefit, and Dixon and Robinson paid Plaintiff and maintained her employment records. Defendants supplied funds to reimburse Dixon and Robinson for the cost of obtaining a personal assistant so that they, as disabled persons, could hope to live independently. This reimbursement feature, which is the aspect that most resembles the action of an employer, is not enough in the face of all of the control exercised by, and benefits realized by Dixon and Robinson, to convert Defendants into a joint employer. Under *Tennessee Coal*, Defendants did not exercise sufficient control over the activities of Plaintiff Fuss, or receive sufficient primary benefit, to render Defendants an "employer." This is especially true where, as here, the express agreement and voluntary understanding of all parties, including Plaintiff Fuss, was that Fuss was employed by disabled persons Dixon and Robinson as a part of their attempt to live independently, including the hiring and supervision of such personal assistants as were necessary to their maintenance and well-being.

At oral argument, Plaintiff maintained on the one hand that the Court can find the State to be Plaintiff's employer in this case without that finding impacting the IL program as a whole. On the other hand, Plaintiff maintains that the "economic reality" that should dictate the outcome of this case is that IL cannot achieve its mission -- making disabled

persons independent -- unless it is able to ensure that its clients have personal caregivers. Plaintiff's argument, taken to its logical conclusion, would place numerous others – including the owner of the residence and the federal government – in practically the same position as Defendants. The Court finds that, on the evidence presented, there is nothing fundamentally different about how IL handled this case and how it handles other cases. The goal of the program is to enable the client to perform every act as an employer, independently. All of the evidence here is that Defendants stayed within the bounds of its program, and no reasonable juror could find that Defendants functioned as Plaintiff's joint employer.

## Conclusion

For the foregoing reasons, the Court finds as a matter of law that an employer-employee relationship did not exist between Defendants and Plaintiff.

Accordingly, **IT IS ORDERED** that Defendants' motion for summary judgment (Pleading No. 19) is **GRANTED** and Plaintiff's claims are dismissed in their entirety. A separate judgment will be entered contemporaneously with this Memorandum Opinion and Order.

                          /s/ P. Trevor Sharp
                        United States Magistrate Judge

Date: August 9, 2006